UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

WCP/FERN EXPOSITION SERVICES, LLC
d/b/a GEORGE FERN CO. PLAINTIFF

v. CIVIL ACTION NO. 3:08-CV-522

JEFFREY P. HALL, *et al.* DEFENDANTS

**MEMORANDUM OPINION**

This matter is before the court on a motion for partial summary judgment by plaintiff/counterclaim defendant WCP/Fern Exposition Services, LLC ("Fern") and summary judgment by defendant Jeffrey Hall ("Hall"). It is also before the court on the motion of Fern, Hugh Michael Cox ("Cox") and Aaron Bludworth ("Bludworth") for summary judgment on one count of Hall's counterclaim against them.

## BACKGROUND

Fern is a company that produces conventions and trade shows. Cox is its Executive Vice President and Bludworth is its Chief Operating Officer. Hall is the former General Manager of Fern's Louisville, Kentucky office. The thrust of Fern's complaint is that Hall, while still employed by Fern, set up a competing exposition business and secured contracts with four of Fern's customers using Fern's confidential business information.

### I. Hall's Employment With Fern

Hall began working for Fern in 1986. Over the years, Hall served as an Account Executive and Production Manager before being promoted to General Manager in 1997. Hall was at all times an at-will employee.

In July 2008, Hall resigned from his position at Fern in order to work for his own exposition company, known as Genesis Exposition Service ("Genesis"). In May 2008, Hall had registered Genesis as an limited liability company with the Kentucky Secretary of State, and that same month had also registered a domain name for Genesis' website. Hall did not tell anyone at Fern about these actions.

On July 8, Hall contacted Cox and told him that he was resigning. On July 9, Hall and Cox met for lunch, at which time Hall explained his plans for Genesis and, according to Cox, stated that he had four of Fern's largest customers in his "back pocket." Later that afternoon, Hall notified employees in the Louisville office of his resignation. Hall's last day in Fern's office was July 11, 2008. He remained on the Fern payroll for a week thereafter, but did not come into the office.

Hall executed a lease on office space for Genesis on July 30, 2008.

## II. Hall's Relationships With Fern Customers

Fern's complaint claims that Hall engaged in wrongful conduct with respect to his relationships with four of Fern's customers: Exhibit Management Associates, the National Society for Histotechnology, the Federal Business Council, and the Greater Louisville Automobile Dealers Association.

### a. Exhibit Management Associates

Exhibit Management Associates ("EMA") is the producer of the Mid-America Trucking Show, an annual trade show for the trucking industry. Fern had worked as a general services contractor for EMA on the Trucking Show for many years, and Fern and EMA had an agreement, memorialized in a letter, stating that Fern would act as contractor for all future Trucking Shows.

In May 2006, Hall met with several EMA executives at EMA's request. At the meeting, EMA executives discussed with Hall the possibility of bringing the general contracting services then performed by Fern "in-house" to EMA, or, alternatively, hiring Hall to head up a separate entity that would perform those services for EMA. The parties did not reach any agreement at this meeting, and Fern went on to produce the 2007 and 2008 Trucking Shows. Hall did not inform anyone at Fern about the substance of this meeting.

On May 29, 2008, again at EMA's request, Hall submitted a two-page proposal to EMA on Genesis letterhead outlining two possible options for a partnership between EMA and Genesis. Hall enclosed with the proposal a document providing anticipated revenue and expenses for Genesis' first year. This document cited revenue and costs based on trade shows Fern had previously produced – specifically, the Trucking Show, the National Society for Histotechnology show, a show produced by the Federal Business Council, and the Greater Louisville Automobile Dealers Association show. The enclosure did not identify any of the shows other than the Trucking Show by name, but Hall has admitted that he used the financial information from these expositions in his proposal. Hall also included with his proposal a document outlining salaries and benefits for three Genesis employees: himself, an unnamed customer service representative, and Jerry Morris, who at the time was employed by Fern. Hall

gave the proposal to Toby Young, his contact at EMA, who then discussed an EMA-Genesis partnership at EMA's board meeting. EMA decided to proceed with negotiations with Hall. Hall did not tell anyone at Fern about this proposal or his discussions with EMA.

A full EMA-Genesis partnership never came to fruition. However, several EMA shareholders eventually acquired ownership interests in Genesis. Hall and his investors hired an attorney in August 2008 to begin putting together an operating agreement for the company. Hall and the EMA investors continued to discuss the details of their arrangement until at least December 2008. EMA eventually retained Genesis to act as a contractor for the March 2009 and March 2010 Mid-America Trucking Shows.

**b. National Society for Histotechnology**

Fern produced an annual symposium for the National Society for Histotechnology ("NSH") for nearly 20 years. In January 1995, NSH signed a five-year continuously renewing agreement with Fern. In January 2008, NSH sent a letter to Fern purporting to terminate its contract with Fern and inviting it to participate in a bidding process for future NSH events. However, Fern continued to make preparations for the 2008 NSH symposium, and did not participate in a bidding process for the NSH contract.

On July 9, 2008 – the day after he announced his resignation – Hall sent an email to one of the NSH meeting planners from his Genesis email address, enclosing a document that had been omitted from NSH's exhibitor kits for the 2008 symposium. It is unclear from the record whether Hall was sending this email on behalf of Genesis or on behalf of Fern. On July 14, 2008, Genesis and NSH entered into a five-year agreement that gave Genesis the NSH symposium contract from 2008 through 2012. Fern later reacquired NSH's business for the 2009, 2010, and

2011 symposia as part of the settlement of a separate breach of contract action between Fern and NSH.

**c. Federal Business Council**

The Federal Business Council ("FBC") produces two military conferences with which Fern previously had involvement: the Armor Warfighting Conference and the Reconnaissance Summit. Fern and the FBC did not have a standing contract for these events. Instead, the FBC would contact Fern each year when it decided to hold an event and the two would work out the terms of their transaction at that time.

On July 9, 2008, Hall submitted two proposals to FBC on behalf of Genesis: one to produce the 2009, 2010, and 2011 Armor Warfighting Conferences, and one to produce the 2008 Reconnaissance Summit. A FBC representative accepted both proposals on October 13, 2008.

**d. Greater Louisville Automobile Dealers Association**

The Greater Louisville Automobile Dealers Association ("GLADA") had worked with Fern to produce its annual automobile show since the 1980s. Fern and GLADA did not have a standing written contract; rather, they operated on a year-to-year basis.

On July 21, 2008, Hall submitted to GLADA a proposal for Genesis to produce the 2009 GLADA New Car Show, with an option to renew in 2010 and 2011. A GLADA representative accepted the 2009 proposal that same day.

**III. Fern's Action Against Hall and Hall's Counterclaim**

In September 2008, Fern sued Hall and Genesis, alleging that Hall breached his fiduciary duties to Fern; that Hall breached his duty of good faith and loyalty as an employee; that Hall tortiously interfered with Fern's existing contracts; that Hall tortiously interfered with Fern's

prospective business relationships; that Hall violated Kentucky's version of the Uniform Trade Secrets Act, KY. REV. STAT. § 365.880 *et seq*.; that Hall stole computer equipment and several other items from Fern; and that Hall fraudulently misrepresented information about the status of events he was assigned to produce on Fern's behalf. Fern seeks compensatory damages (which it claims exceed $1.8 million), injunctive relief, and punitive damages. Fern now moves for summary judgment in its favor on Counts 1, 2, 3, 4, and 6 of its complaint (breach of fiduciary duty, breach of good faith and loyalty, tortious interference with contract, tortious interference with business relationships, and conversion, respectively). Hall has moved for summary judgment or to dismiss all of Fern's claims against him.

In October 2008, Hall countersued Fern, Bludworth, and Cox. He claimed that Cox and Bludworth, acting in their capacities as Fern officers, told current and former Fern employees, vendors, and customers that Hall was unethical and stole both business and tangible objects from Fern. Hall also claimed Fern tortiously interfered with a relationship between Fern and one of its clients. Fern, Bludworth, and Cox have moved for summary judgment on Hall's defamation claim.

## ANALYSIS

### I. Motions for Summary Judgment on Fern's Claims

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when there is "sufficient evidence on which the jury could reasonably find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). The disputed issue need not be resolved conclusively in favor of the non-

moving party, but that party must present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). The evidence must be construed in the light most favorable to the non-moving party. *Blakeman v. Mead Containers*, 779 F.2d 1146, 1150 (6th Cir. 1985).

**a. Breach of Fiduciary Duty**

The first count of Fern's complaint alleges that Hall breached his fiduciary duty to Fern by preparing to compete and actually competing with it while still employed by Fern, recruiting Fern customers and employees to do business with or work for Genesis, and "generally failing to act in the best interests of Fern and its business." Compl. ¶ 25. Both Fern and Hall have moved for summary judgment on this count.

To prevail on a claim for breach of fiduciary duty under Kentucky law, a plaintiff must prove that (1) the defendant owed a fiduciary duty to the plaintiff; (2) the defendant breached that duty; and (3) the plaintiff suffered damages as a result of the breach. *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 665 (E.D. Ky. 2009) (citing *Sparks v. Re/Max Allstar Realty, Inc.*, 55 S.W.3d 343, 348 n.15 (Ky. App. 2000)).

A fiduciary relationship "is one founded on trust or confidence, reposed by one person in the integrity and fidelity of another." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). Such a relationship "involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Id.* A fiduciary duty may arise from an employer-employee relationship, *see, e.g.*, *Fastenal*, 609 F. Supp. 2d at 665, although whether this is the case for employers who are not corporate officers

or directors depends on the "specific circumstances" of the employment. *Miles Farm Supply, LLC v. Helena Chemical Co.*, No. 4:06-CV-23, 2008 WL 3010064 at *7 (W.D. Ky. Aug. 1, 2008). An employee's placement "in a position of trust" such that he has "access to confidential corporate information" may give rise to a fiduciary duty. *Stewart v. Ky. Paving Co.*, 557 S.W.2d 435, 438 (Ky. App. 1977).

The record shows that Hall held a "position of trust" with Fern. As General Manager of the Louisville office, Hall supervised approximately two dozen full-time employees and at times oversaw up to 300 part-time workers. Hall signed and approved labor agreements on the Fern's behalf, and had the authority to approve large contracts and expenditures without prior approval. Moreover, Cox and Bludworth both described Hall as having been given more responsibility with respect to the operations of the business as a whole than other general managers. Cox states that Hall oversaw the entire computerized registration system, helped a company that had been acquired by Fern bring its procedures in line with Fern's procedures, and had input into negotiations with a company Fern was considering acquiring. All of these facts indicate that Fern trusted Hall with substantial responsibilities within the company.

The record also shows that Hall had access to data that could be classified as "confidential corporate information." Bludworth testified that Hall worked on designing a system to track profit and loss information company-wide, and thus had full access to the information in Fern's financial computer system. Bludworth testified that only a few Fern employees other than Hall would have had such access: one or two members of the finance staff, one or two members of the information technology staff, and possibly Cox. Given that a limited

number of employees had access to this sort of data, such information is properly considered "confidential corporate information."[1]

Hall argues that he bore Fern no fiduciary duty because there were "limitations" on his authority such that he did not actually hold a position of trust. Hall specifically cites the fact that capital expenditures and any personal expenses he billed to the company had to be approved by his supervisors and claims that his managerial autonomy decreased following the acquisition of Fern by Wachovia Capital Partners in 2005. These arguments are unavailing. Few workers have unfettered discretion with respect to every aspect of their jobs, but this does not mean that they do not occupy positions of trust. And while Hall alleges that he was "micro-managed" following the Wachovia acquisition, he does not explain in detail how this changed his managerial responsibilities or removed him from a position of trust. Hall also notes that after 2007, he no longer had full access to Fern's accounting system and financial documents because of a change in Fern's computer system. However, the fact that Hall no longer had unlimited access to Fern's entire computer system for the last year of his employment does not change the fact that he had such access during the vast majority of his tenure as a General Manager.[2]

---

[1]Hall also had access to profit and loss data for individual trade shows produced by the Louisville office, as well as profit and loss data for the location as a whole. The record shows that a larger group of Fern employees had access to this information than had access to the company-wide data, although it was still accessible only by employees who had been specifically granted access to that portion of the computer system.

[2]The circumstances of Hall's employment are similar to those we examined in *Service Drywall Co. v. Commonwealth Walls, Inc.*, No. 3:06-CV-372-S, 2008 U.S. Dist. LEXIS 34683 (W.D. Ky. Apr. 26, 2008). In *Service Drywall*, this court concluded that a "branch manager" of a drywall business owed his employer a fiduciary duty because his position gave him substantial "oversight and control" over operations of his employer's Louisville office and substantial access to the company's confidential business information. *Id.* at *6–*7. The record in *Service Drywall* showed that the employee was responsible for "selling the company" to prospective clients, as well as managerial tasks such as providing estimates and bids, budgeting, billing, procuring materials for

continue...

Hall also argues that he was not a fiduciary because he – unlike more senior members of the company – was never required to sign any document affirming his fiduciary relationship with Fern. Additionally, Hall makes much of a profit-sharing agreement that he was asked to but refused to sign. This agreement, which was offered to Hall and other members of Fern management following the Wachovia acquisition, included a provision that expressly disclaimed any fiduciary relationship between Fern and the signatory employee. Both of these arguments do little to help Hall's case. As we noted in *Service Drywall Co. v. Commonwealth Walls, Inc.*, the lack of a written agreement prevents an employer "from imposing any contractual fiduciary duty upon [the employee]" but does not "relieve [the employee] of his common law fiduciary duty." 2008 U.S. Dist. LEXIS 34683 (W.D. Ky. 2008). We therefore conclude that Hall owed Fern a fiduciary duty under Kentucky law.

The duty owed by an employee-fiduciary under Kentucky law "includes the obligation to not act against the employer's interests, not to establish a competing interest until after the employment relationship is terminated, and, finally, requires the employee-fiduciary to disclose to the employer any information which could damage the company." *DSG Corp. v. Anderson*, 754 F.2d 678, 682 (6th Cir. 1985) (citations omitted). After an employee-fiduciary terminates his fiduciary relationship, he is free to set up a competing enterprise, and "may carry with him his personal experience, enterprise, and knowledge, but he may not use prior fiducial confidences to

---

[2]...continue
jobs, and approving time sheets and payroll applications. *Id.* Moreover, the employee had access to the company's confidential customer database, bid and pricing information, and could receive "any information he needed" from the company on request. *Id.* The record here shows that Hall had a similar level of responsibility and access to information in his position with Fern.

profit at the expense of his former employer." *Aero Drapery of Kentucky, Inc., v. Engdahl*, 507 S.W.2d 166, 169–70 (Ky. 1974).

Fern claims that Hall breached his fiduciary duties by meeting with EMA representatives in 2006 to discuss a possible partnership; by officially forming Genesis in May 2008; by making the May 2008 partnership/investment proposal to EMA executives and using profit and loss data from prior Fern shows therein; by neglecting his duties to secure long-term contracts on Fern's behalf so Genesis could later profit; and by taking steps to secure contracts between Genesis and Fern customers before his employment with Fern ended. Hall claims that Fern cannot prove that he engaged in any competitive activities while still an employee-fiduciary.

Here, there is an issue of material fact as to whether Hall breached his duties to Fern. On one hand, there is evidence that Hall brought Genesis into existence and may have engaged in competitive activities on its behalf while still employed by Fern. Hall's 2006 meeting with EMA, his May 2008 proposal, and his registration of Genesis' business name and domain name could all be classified as the setting up of an enterprise that directly competed with Fern. Hall also submitted his May 2008 proposal to EMA on Genesis letterhead, which could be construed as evidence that Genesis was an established operation prior to Hall's departure from Fern. Moreover, Hall secured contracts with two former Fern customers (GLADA and NSH) within days of his resignation, which could give rise to the inference that Hall engaged in talks or negotiations with these organizations before leaving Fern. In short, a reasonable jury could conclude that Hall set up a competing enterprise before leaving Fern and possessed information (such as the knowledge that current Fern customers were in talks to do business with Genesis) that he had an obligation to disclose to Fern.

On the other hand, Hall's actions are not conclusive evidence of a breach. Hall claims that he did not make a definitive decision as to whether he would leave Fern until the day he actually resigned. Hall and Toby Young, his contact at EMA, both characterize the 2006 meeting and 2008 proposal as part of a "feeling out" process to determine the potential viability of an EMA-Genesis partnership rather than a definitive step toward establishing a business. This characterization is underscored by the fact that Genesis and the EMA investors did not start drawing up articles of organization until August 2008 – indicating that the decision to go into business together was far from certain until after Hall's resignation. Hall also claims that his decision to file with the Secretary of State and to reserve Genesis' web domain were meant only to reserve the Genesis name and domain in the event Hall decided to use it in the future.

Although these assertions are largely self-serving and derived primarily from Hall's own deposition testimony, they nonetheless provide evidence from which a rational jury could find that Hall did not breach his duty to Fern. While employee-fiduciaries are not permitted to form a competing company while still fiduciaries, merely discussing the possibility of forming such a concern is not a breach of such duty. *See ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 716 (6th Cir. 2005) ("clandestine" meeting by employees to plan for opening of a rival enterprise not a breach of fiduciary duty); *see also Miles Farm Supply*, 2008 WL 3010064 at *12–*13 (no breach of fiduciary duty where employees discussed joining a rival company, but "no promises" were made and employees continued to perform their duties to current employer). If, as Hall claims, Genesis remained a hypothetical future concern until the day of his resignation, then his meeting with and proposal to EMA and Young could be classified as simply "planning" for a potential partnership that might or might

not develop. Hall's filing with the Secretary of State and his registration of the domain name are also not out of line with the idea that he might have only "planned" Genesis prior to his resignation. Unlike, for instance, seeking out and reserving office space or purchasing advertising, *see Aero Drapery*, 507 S.W.2d at 168, filing registration papers with the Secretary of State or registering a domain name are steps that could reasonably be taken as a "just in case" measure to preserve the name of a potential future business. We therefore conclude that there is a question of material fact as to whether Hall impermissibly "set up" Genesis while still employed with Fern or simply discussed or planned for its possible existence.[3]

The record also does not definitively establish that Hall used fiduciary confidences to profit at Fern's expense. Hall did present profit and loss information from four of Fern's prior shows in his proposal for a business partnership with EMA. However, it is unclear from the record whether such information could be considered a "fiduciary confidence." The record shows that at least five Fern employees in the Louisville office other than Hall would likely have had access to such information. The record also shows that Fern never required these employees to sign confidentiality agreements. Thus, it is unclear if the profit and loss information for individual shows could be considered "confidential," much less a "fiduciary confidence."

---

[3]We also reject Fern's arguments for summary judgment solely on the basis that Hall may have conducted competitive activities while still on Fern's payroll. The end of a fiduciary relationship is marked by the "termination of actual responsibilities," not the end of an employee-fiduciary's presence on a company's payroll. *Aero Drapery*, 507 S.W.2d at 170. Hall told Cox that he was resigning on Tuesday, July 8. He came into work briefly on July 9 to announce his departure to the staff, and spent the next two days in the office, although whether he still held "actual responsibilities" is unclear. Hall remained on Fern's payroll through the end of the following week but did not come into the office. Hall says this was the result of his being paid for unused vacation days.

Finally, Hall argues that he is entitled to summary judgment because Fern cannot show that his actions were the proximate cause of Fern's loss of business. The record contains limited information on this count – much in the form of opinions and conflicting deposition testimony. There is a clear factual dispute as to the cause of the four customers' decisions to leave Fern. Summary judgment on this ground is therefore also not warranted at this time.

**b. Breach of Duty of Good Faith and Loyalty**

The second count in Fern's complaint alleges that Hall breached the duty of good faith and loyalty owed to an employer by an employee. Both Hall and Fern have moved for summary judgment on this count.

Fern claims that under Kentucky law, "any employee" owes "a duty to render loyal, diligent, faithful, and obedient service to his or her employer." In support of this assertion, Fern cites four Kentucky cases. Three of them – *City of Lancaster v. Trumbo*, 660 S.W.2d 954 (Ky. App. 1983), *Brown Hotel Co. v. White*, 365 S.W.2d 306 (Ky. App. 1962), and *Shamrock Coal Co., Inc. v. Taylor*, 697 S.W.2d 952 (Ky. App. 1985) – address whether unemployment benefits could properly be denied on the grounds that an employee was fired for misconduct. Although these cases held that failure to be "loyal, diligent, faithful and obedient" constituted "misconduct" that warranted the denial of benefits, they did not explicitly create an independent cause of action that would allow employers to sue disloyal, lazy, unfaithful, or disobedient employees who are not employed in a fiduciary capacity.

The final case Fern cites, *Hoge v. Kentucky River Coal Corp*, 287 S.W. 226 (Ky. App. 1926), addressed alleged self-dealing by an agent who had been appointed to acquire land on behalf of a coal company. The court in that case held that "[e]veryone – whether designated

agent, trustee, servant or what not – who is under contract or other legal obligation to represent or act for another in any particular business or for any valuable purpose must be loyal and faithful to the interest of such other in respect to such business or purpose." *Id.* at 227. This case, however, also fails to support Fern's assertion that there exists an independent cause of action for a breach of an ordinary employee's "duty of loyalty." The rule articulated in *Hoge*, by its own terms, applies to individuals "under contract or other legal obligation to represent or act for another." It says nothing about the liability of ordinary, non-fiduciary employees for disloyal conduct.

Because Fern has not shown that there exists a cause of action between an employer and a non-fiduciary employee with respect to loyalty, diligence, good faith, or obedience, Hall's motion for summary judgment on this count will be granted.

**c. Tortious Interference With Contract & Prospective Business Relations**

The third and fourth counts of Fern's complaint allege that Hall tortiously interfered with contractual relations with respect to NSH and EMA (with whom Fern claims it had contracts) and with prospective business relationships with respect to GLADA and FBC (with whom Fern did not have contracts) and NSH and EMA (to any extent it could be found Fern did not have contracts).

Kentucky courts use the definitions contained in the Restatement (Second) of Torts when determining liability for each of these causes of action.[4] *Nat'l Collegiate Athletic Ass'n v.*

---

[4]Section 766 of the Restatement defines intentional interference with contractual relations as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or

continue...

*Hornung*, 754 S.W.2d 855, 857 (Ky. 1988). Both torts require that the interference be "malicious or without justification, or . . . accompanied by some unlawful means such as fraud, deceit, or coercion." *Steelvest*, 807 S.W.2d at 487.

Summary judgment for either party is inappropriate here for the same reasons it was inappropriate on Fern's claim for breach of fiduciary duty. In order to prevail on either of these theories, a plaintiff must show not just that a defendant interfered with the plaintiff's business relationships, but that such interference was improper. Here, the question of whether Hall's actions were malicious, without justification, or accompanied by unlawful means is in dispute: Fern claims that all of Hall's actions with respect to the acquisition of these clients were improper (specifically in the sense that they were undertaken while he was still employed at Fern), but Hall argues that they were not (in the sense that they were not undertaken until he

---

[4]...continue

> otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.
>
> RESTATEMENT (SECOND) OF TORTS § 766 (1979).

The Restatement defines intentional interference with prospective business relations as follows:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation
>
> or
>
> (b) preventing the other from acquiring or continuing the prospective relation.
>
> RESTATEMENT (SECOND) OF TORTS § 766B (1979).

resigned). A rational jury could find either interpretation plausible, and both Hall's and Fern's motions on this count will therefore be denied.

**d. Uniform Trade Secrets Act Violation**

The fifth count in Fern's complaint alleges that Hall violated Kentucky's version of the Uniform Trade Secrets Act (KUTSA), as codified at KY. REV. STAT. § 365.880 *et seq*. To prevail on a KUTSA claim, a plaintiff must prove (1) that the information it seeks to protect qualifies as a protected trade secret; and (2) that the protected information has been misappropriated. *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 890–91 (E.D. Ky. 2003). The Act defines "trade secret" as

> . . . information, including a formula, pattern, compilation, program, data, device, method, technique or process, that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainably by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
>
> KY. REV. STAT. § 365.880(4).

We first note that Fern has provided only limited information about the secrets it claims Hall misappropriated. Fern's complaint references only "confidential trade secret information." Compl. ¶ 48. Fern provides slightly more detail in its response to Hall's motion for summary judgment, claiming that Hall misappropriated "confidential financial data, customer information, business forms and other materials" and noting that "all of the customer contracts and forms that Hall and Genesis used" when Genesis first began doing business were "virtual carbon copies" of

Fern contracts and forms and included references to "George E. Fern Co." Pl.'s Resp. to Def.'s Mot. for Summ. J. at 16.

Hall argues that the information Fern claims he misappropriated was either not a protectable trade secret because it was not subject to reasonable efforts to preserve its secrecy or, alternatively, that such information was readily ascertainable from a legitimate source, and therefore not protected. *See ATC*, 402 F.3d at 716. Specifically, Hall claims that the financial information he allegedly took was available to many Fern employees, none of whom had to sign confidentiality agreements; that some items, such as exhibitor order forms, were available online; that a pre-drawn floor plan for the Trucking Show and a proposal for the GLADA show were actually provided to him by those clients, rather than acquired from Fern; and that there was never a proposal on file at Fern for any FBC show, and therefore Hall could not have misappropriated it.

Fact issues preclude granting summary judgment on this count. First, it is unclear from the record whether Fern's financial information was the subject of reasonable efforts to keep it confidential. As explained above, there is some evidence that Fern took steps to keep this data secret – for instance, by requiring an individual computer system login with a password to access it. However, there is also evidence that such access was not difficult to come by, and that most, if not all, Fern employees, were not bound by confidentiality agreements. It is also unclear from the record whether the materials Fern claims Hall misappropriated were available from a legitimate source. Bludworth did unequivocally admit that exhibitor order forms were available online, which would render them unprotected, as Hall would have been able to access them from a legitimate source. However, it is not evident from the record that Hall actually acquired the

Trucking Show floor plan and the GLADA proposal from customers. And it is also unclear whether a Fern proposal to FBC was, in fact, nonexistent. Although Fern's FBC contact stated that he never recalled receiving such a proposal, this is not sufficient evidence on which to grant summary judgment. Finally, there is a question of fact as to whether the information contained in the proposals, letters, and contracts Hall issued to his customers constituted knowledge he carried with him from his prior position at Fern to his new position at Genesis, rather than misappropriated trade secrets. Summary judgment is inappropriate on this count.

**e. Conversion**

The sixth count in Fern's complaint alleges that Hall is liable for conversion with respect to several items of property he allegedly took from Fern. Specifically, Fern claims Hall took 65 computer terminals that Fern had previously used for electronic registration, several equipment cases and computer bags, and a paper shredder. Both Fern and Hall have moved for summary judgment on this count.

"'Conversion' is the wrongful exercise of dominion and control over another's property." *Airbrush Express, Inc. v. Jefferson Mall Co., L.P.*, No. 03-691-C, 2005 U.S. Dist. LEXIS 44785 at *9 (W.D. Ky. Jun. 30, 2005). To prevail on a conversion claim under Kentucky law, a plaintiff must prove seven elements: (1) that the plaintiff had legal title to the converted property; (2) that the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) that the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) that the defendant intended to interfere with the plaintiff's possession; (5) that the plaintiff made some demand for the property's return which the defendant refused;

(6) that the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) that the plaintiff suffered damage by the loss of the property. *Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005) (citing 90 C.J.S. TROVER AND CONVERSION § 4 (2004)).

Summary judgment on this count is inappropriate because there is a genuine dispute of material fact as to whether Fern had legal title to the property at the time Hall took it or whether Fern had given Hall permission to take it. Hall stated in deposition testimony that he had received permission from Fern's information technology manager to take the computer terminals and equipment cases, and includes with his motion for summary judgment an electronic message purporting to give him permission to take the terminals for his own use. However, that same manager stated in an affidavit included with Fern's motion for summary judgment that he did not and never intended to give Hall such permission. Hall also asserts that Fern did not, in fact, own the computer bags and paper shredder, while Fern asserts that it did. Evidence of ownership of these items is scant in the record as it stands, and summary judgment for either party is therefore not appropriate.

Hall argues, in the alternative, that this action must be dismissed pursuant to Rule 12(b)(6) because Fern never demanded the return of the items Hall allegedly took. Fern, however, correctly points out that a plaintiff in a conversion action need not plead a demand for return where the plaintiff claims that the taking was wrongful from the outset, rather than an initially lawful taking that later became unlawful. *Kendrick v. Standard Fire Ins. Co.*, No. 06-141-DLB, 2007 U.S. Dist. LEXIS 28461 at *43–*45 (E.D. Ky. Mar. 31, 2007) (citing *Joseph Goldberger Iron Co. v. Cincinnati Iron & Steel Co.*, 154 S.W. 374 (Ky. App. 1913)). Here, Fern

claims that Hall's taking of the items was wrongful from the moment he took them because Fern never gave Hall permission to take such items for his own use; thus, it need not plead a demand for their return, and this count will not be dismissed under Rule 12(b)(6).

**f. Fraudulent Misrepresentation**

The seventh count of Fern's complaint alleges that Hall misrepresented material facts with respect to, among other things, the status and progress of exhibitions that Hall was responsible for producing on Fern's behalf. Hall has moved for dismissal of this count pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

In Kentucky, "the tort of intentional misrepresentation is equivalent to fraud." *Weiss v. Astellas Pharma US, Inc.*, 2006 WL 1285406 at *1 (E.D. Ky. 2006) (citing *Morton v. Bank of the Bluegrass & Trust Co.*, 18 S.W.3d 353, 358 (Ky. App. 1999)). Rule 9(b) of the Federal Rules of Civil Procedure requires that a party "state with particularity the circumstances constituting fraud or mistake." The Sixth Circuit has interpreted this rule to mean that a plaintiff must, "at a minimum . . . allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex, L.P.*, 2 F.3d 157, 162–62 (6th Cir. 1993). Stated differently, Rule 9(b) requires the plaintiff to "specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006).

Fern's complaint puts forth its fraud allegations as follows:

> 59. Prior to his resignation from Fern, Defendant Hall made material representations of past or existing fact to Fern concerning its business, including but not limited to misrepresentations about the status and progress of one or more exhibitions that Hall was responsible to produce and was allegedly producing on behalf of Fern.

> 60. Defendant Hall's misrepresentations were false and were made intentionally, for the specific purpose of inducing Fern to rely upon them to its detriment.
>
> 61. Defendant Hall did induce Fern to actually and justifiably rely upon his false representations to its detriment.
>
> Compl. ¶¶ 59–61.

Fern provides a somewhat more detailed explanation of its fraud allegations in its response to Hall's motion for summary judgment, claiming first that Hall made "numerous misrepresentations of fact" to Fern managers and identifying two specific examples of alleged misrepresentation: assertions from Hall in monthly business review meetings that the EMA, NSH, FBC, and GLADA accounts were in "great shape" and Hall's representations to Fern employees that Fern would be producing the 2008 NSH show, which Genesis actually produced.

Fern's allegations of fraudulent misrepresentation fail to provide a basis for a fraud action. We first note that the allegations in Fern's complaint do not meet the requirements of Rule 9(b) because they do not identify the time, place, or content of the alleged misrepresentations. The more detailed allegation in Fern's response regarding the 2008 NSH conference also falls short of the Rule 9(b) standard. Fern contends only that Hall told employees that Fern would be producing the 2008 NSH show, but does not identify the time or place of these representations. Fern's claim with respect to this statement must be dismissed.

Fern's allegation with respect to Hall's statements in the business review meetings must also be dismissed. An alleged misrepresentation in a fraud action "must relate to a past or present material fact." *McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky. 1955). "A mere statement of opinion or prediction may not be the basis of an action." *Id.* The only statements Fern claims Hall made were general assurances that the accounts in question were in

"great shape." Such an assertion is a statement of opinion, not fact, and therefore provides no actionable basis for a fraud claim.

**II. Motion for Summary Judgment on Hall's Defamation Claim**

Fern, Bludworth, and Cox also move for summary judgment on Hall's counterclaim for defamation. Hall's counterclaim alleges that Cox and Bludworth, in their capacities as Fern employees, made statements to other Fern employees, vendors, and customers accusing Hall of stealing from Fern and calling him unethical. Hall specifically identifies six[5] such instances in his response to the counterclaim defendants' motion for summary judgment:

> 1. A discussion between Cox and Chris Patch, a Fern employee, in which Cox allegedly told Patch that Hall "stole business" from Fern. Cox denies making such a statement.
>
> 2. A discussion between Cox and Harold Franklin, an information technology contractor that worked with Fern, in which Cox allegedly told Franklin that Hall "stole business" from Fern. Cox denies making such a statement.
>
> 3. Allegations by Bludworth that Hall "stole business" and was "unethical." Bludworth has admitted in deposition testimony that he likely did make such statements, but did so only to others within Fern. Moreover, he stated that any allegations that Hall was "unethical" would have taken place in the context of discussions of this litigation.
>
> 4. A statement by Bludworth, apparently during a meeting with Hall's counsel and Toby Young of EMA that Hall might attempt to "sabotage" any settlement agreement between the parties.
>
> 5. A discussion between Bludworth and Fern executive J.T. Barclay in which Bludworth allegedly made a comment that Hall "stole" the computer equipment that is the subject of the conversion claim in this action.
>
> 6. A discussion between former Fern employee Jerry Morris in which Bludworth allegedly stated that he was not sure that Hall's actions with respect to Genesis were illegal, but at least were unethical.

---

[5]Hall also cites deposition testimony in which Cox admits he may have referred to Hall as "unethical," but could not recall whether he had done so or in what context.

A plaintiff must set forth four elements to establish a prima facie claim of defamation: (1) defamatory language; (2) about the plaintiff; (3) that is published; and (4) which causes injury to reputation. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004). Defamatory language is language which "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* (quoting Restatement (Second) of Torts § 559 (1977)). Such language is published "when it is intentionally or negligently communicated to someone other than the party defamed." *Id.* at 794.

There is little question that the language at issue here was about Hall, communicated to a third party, and was injurious to Hall's reputation. However, Fern, Bludworth, and Cox claim that they are entitled to summary judgment because the statements are privileged as expressions of opinion, or, in the alternative, that they are privileged as statements relating to the conduct of employees. Hall claims that neither privilege applies.

Statements of opinion do not form an actionable basis for a defamation clam unless the opinion "implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Yancey v. Hamilton*, 284 S.W.2d 854, 857 (Ky. 1989). A statement of opinion is not actionable "where the commentator states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is clearly based." *Holley Perf. Prods. v. Smith-CNC China Network Co.*, No. 1:06-CV-165-M, 2009 U.S. Dist. LEXIS 33670 at *13 (W.D. Ky. Apr. 21, 2009) (quoting *Stringer*, 151 S.W.3d at 796). This rule is grounded in the premise that "[t]he reader is in as good a position as the author to judge whether the conclusion" is correct. *Lassiter v. Lassiter,* 456 F. Supp. 2d 876, 882 (E.D. Ky. 2006).

Five of the six instances of defamatory statements Hall cites qualify as privileged expressions of opinion. Statements that Hall "stole business" from Fern simply do not imply the existence of any undisclosed defamatory fact. Business cannot be "stolen" in the way tangible goods are. When a company's client moves to a competitor, the decision to do so ultimately rests with the client. Although a competitor might use tactics to woo the client of which the original company disapproves, there can really be no crime of theft in this context, and therefore allegations that Hall "stole" business are pure opinion. Similarly, statements that Hall's behavior was "unethical" in this context are clearly related to Hall's departure from Fern and his subsequent acquisition of four prior Fern customers; such statements may express Bludworth and Cox's disapproval of Hall's actions, but are not based on undisclosed defamatory facts. Finally, Bludworth's "sabotage" comment also qualifies as privileged opinion because it was simply a prediction about a possible future event; it thus could not be grounded in *any* fact, much less a defamatory one, and is protected as pure opinion.

Bludworth's alleged comment to Barclay that Hall stole the computer equipment does not qualify for the opinion privilege because it is based on fact: the comment accuses Hall of having committed a crime. However, an employer's internal statements regarding employee conduct are protected by a qualified privilege. *Stringer*, 151 S.W.3d at 796. Such privilege may be waived if it is not used in a reasonable manner and for a proper purpose. *Id.* (citing *Tucker v. Kilgore*, 388 S.W.2d 112, 115). Here, there is no evidence that Bludworth, in asserting to Barclay, a fellow Fern executive, that he believed Hall might have stolen the equipment, abused or exceeded such a privilege. Moreover, there is no evidence that Bludworth's statement was grounded in malice. Hall cites a number of instances that reflect Bludworth's apparent disapproval of Hall's manner

of departure and his acquisition of former Fern customers, but none rises to the level of “ill will” or “hatred.” *See Brewer v. Amer. Nat. Ins. Co.*, No. 82-5039, 1983 U.S. App. LEXIS 13119 (6th Cir. Apr. 27, 1983) at *20–*21. There is also no evidence Bludworth’s statement was made with “reckless disregard” for its truth or falsity. *Id.* We accordingly conclude that Bludworth’s alleged assertion that Hall stole computer equipment from Fern was protected by a qualified privilege.

Hall also notes that he “believed” that Fern representatives shared defamatory information to individuals outside of Fern However, he has not specifically identified any such statements and offers nothing to support such belief. His claim will therefore not survive summary judgment.

**III. Oral Argument**

Upon review, the court finds that oral argument in this case is unnecessary.

**CONCLUSION**

For the foregoing reasons, we will deny Fern’s motion for summary judgment with respect to its claims against Hall and grant Fern, Cox and Bludworth’s motion for summary judgment with respect to Hall’s defamation claim against them. We will deny Hall’s motion for summary judgment with respect to Fern’s breach of fiduciary duty, tortious interference, KUTSA and conversion claims, but will grant it with respect to Fern’s breach of loyalty and fraud claims.

A separate order will issue in accordance with this opinion.

March 26, 2011

**Charles R. Simpson III, Judge**
**United States District Court**